

AO 106A  (08/18)  Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

for the

District of Delaware

FILED

JUL 16 2020

US DISTRICT COURT
DISTRICT OF DELAWARE

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>information associated with Discord User Name "BIMMY"<br>with User ID #4323, that is stored at premises controlled<br>by Discord, Inc. | )<br>)<br>)<br>)<br>)<br>) |

Case No. 20- 177 M

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

Please see Attachment A.

located in the _____Northern_____ District of _____California_____ , there is now concealed *(identify the person or describe the property to be seized)*:

Please see Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☐ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. 2422(b) | Coercion and Enticement of a Minor and<br>Attempted Coercion and Enticement of a Minor |

The application is based on these facts:
Please see attached Affidavit.

- ☑ Continued on the attached sheet.
- ☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Francis Cesare, Special Agent, FBI
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
_____telephonic conference_____ *(specify reliable electronic means)*.

Date: July 16, 2020

_____
*Judge's signature*

City and state:  Wilmington, Delaware

Hon. Jennifer L. Hall, U.S. Magistrate Judge
*Printed name and title*

FILED

JUL 16 2020

US DISTRICT COURT
DISTRICT OF DELAWARE

IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF DELAWARE

| | |
|---|---|
| IN THE MATTER OF | ) |
| SEARCH OF INFORMATION | ) |
| ASSOCIATED WITH DISCORD USER | ) Case No. 20-177 M |
| NAME "BIMMY" WITH USER ID #4323, | ) |
| THAT IS STORED AT PREMISES | ) |
| CONTROLLED BY DISCORD, INC | ) |

**AFFIDAVIT IN SUPPORT OF
AN APPLICATION FOR A SEARCH WARRANT**

I, Francis Cesare, Special Agent with the Federal Bureau of Investigation, being first duly

sworn, hereby depose and state as follows:

**INTRODUCITON AND AGENT BACKGROUND**

1.      I make this affidavit in support of an application for a search warrant for

information contained in, or associated with, the following Discord, Inc., (hereinafter,

"Discord") account:

- Username "Bimmy" with User ID #4323 (the "Target Account")

The account is stored at premises owned, maintained, controlled, and/or operated by Discord, a

social-networking company headquartered in San Francisco, California.  The information to be

searched is described in the following paragraphs and in Attachment A.  This affidavit is made in

support of an application for a search warrant under 18 U.S.C. §§ 2703(a), (b)(1)(A), and

(c)(1)(A), and Federal Rule of Criminal Procedure 41, to require Discord to disclose to the

government records and other information in its possession, including the contents of

communications, pertaining to the subscriber or customer associated with the Target Account.

2.      I have been a Special Agent with the Federal Bureau of Investigation (FBI) since

September 2018, and in that time, I have worked on both the Baltimore Joint Terrorism Task

1

Force and the Delaware Joint Terrorism Task Force, where I am currently assigned. During my tenure with the FBI, I have gained experience investigating federal criminal violations including international and domestic terrorism violations. Among other things, I have conducted or participated in surveillances, execution of search/arrest warrants, reviewed surveillance footage and monitored phone conversations. Prior to being employed with the FBI, I was a sworn law enforcement officer with the New Jersey Division of Criminal Justice for approximately three years and investigated narcotics violations and other violations of the New Jersey Criminal Code. In addition, for approximately two years, I served as uniformed law enforcement officer with the United States Capitol Police. My training includes courses at the Federal Training Law Enforcement Center (FLETC), located in Glynco, Georgia, The New Jersey Division of Criminal Justice Academy located in Sea Girt, New Jersey, and the FBI academy Basic Field Training Course, Quantico, Virginia. I am a federal law enforcement officer within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C), that is, a government agent engaged in enforcing the criminal laws and duly authorized by the Attorney General to request a search warrant.

3.     As set forth more fully below, there is probable cause to believe that James Crossan (hereinafter CROSSAN) used the Target Account to entice and coerce, and to attempt to entice and coerce, a person he believed to be a minor to engage in unlawful sexual activity, to wit, the production of child pornography, in violation of Title 18, United States Code, Section 2422(b) (Coercion and Enticement of a Minor and Attempted Coercion and Enticement of a Minor) (the SUBJECT FEDERAL OFFENSES).

4.     The statements in this affidavit are based on my personal observations, my training and experience, and information obtained from other law enforcement officers and

witnesses.  Since this affidavit is being submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me concerning this investigation.  I have set forth only the facts that I believe are necessary to establish probable cause to believe that evidence, fruits, and instrumentalities of violations of the SUBJECT FEDERAL OFFENSES are contained in the Target Account.

## PERTINENT CRIMINAL STATUTES

5.      This investigation concerns alleged violations of Title 18, United States Code, Section 2422(b), which makes it a federal crime to persuade, induce, entice, or coerce any individual who has not attained the age of 18 years to engage in any sexual activity for which any person can be charged with a criminal offense, or attempt to do so.

6.      This investigation concerns alleged enticement and attempted enticement to produce child pornography.  The production of child pornography is prohibited in Title 18, United States Code, Section 2251(a), which makes it a federal crime to persuade, induce, entice, or coerce a minor to engage in sexually explicit conduct for the purpose of producing a visual depiction thereof, with reason to know that such visual depiction will be transported in or affecting interstate or foreign commerce by any means, including by computer.

## DEFINITIONS

7.      The following definitions apply to this Affidavit:

a.      "Child erotica," as used herein, means materials or items that are sexually arousing to persons having a sexual interest in minors but that are not, in and of themselves, obscene or that do not necessarily depict minors in sexually explicit poses or positions.

b.      "Child pornography," as used herein, includes the definitions in 18 U.S.C. §§ 2256(8) and 2256(9) (any visual depiction of sexually explicit conduct where (a) the production of the visual depiction involved the use of a minor engaged in sexually explicit conduct, (b) the visual depiction is a digital image, computer image, or computer generated image that is, or is indistinguishable

3

from, that of a minor engaged in sexually explicit conduct, or (c) the visual depiction has been created, adapted, or modified to appear that an identifiable minor is engaged in sexually explicit conduct). *See* 18 U.S.C. §§ 2252 and 2256(2).

c. "Computer," as used herein, is defined pursuant to 18 U.S.C. § 1030(e)(1), as "an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical, arithmetic or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device."

d. "Internet Protocol address" or "IP address" refers to a unique number used by a computer to access the Internet and is associated with a physical address. IP addresses can be dynamic, meaning that the Internet Service Provider (ISP) assigns a unique and different number to a computer every time it accesses the Internet. IP addresses might also be static, if an ISP assigns a user's computer a particular IP address which is used each time the computer accesses the Internet.

e. The terms "records," "documents," and "materials," as used herein, include all information recorded in any form, visual or aural, and by any means, whether in handmade form (including, but not limited to, writings, drawings, paintings), photographic form (including, but not limited to, microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, photocopies), mechanical form (including, but not limited to, phonograph records, printing, typing) or electrical, electronic or magnetic form (including, but not limited to, tape recordings, cassettes, compact discs, electronic or magnetic storage devices such as floppy diskettes, hard disks, CD-ROMs, digital video disks (DVDs), personal digital assistants (PDAs), multimedia cards (MMCs), memory sticks, optical disks, printer buffers, smart cards, memory calculators, electronic dialers, or electronic notebooks, as well as digital data files and printouts or readouts from any magnetic, electrical or electronic storage device).

f. "Sexual activity for which any person can be charged with a criminal offense," as defined in 18 U.S.C. § 2427, includes the production of child pornography.

g. "Sexually explicit conduct" means actual or simulated (a) sexual intercourse, including genital-genital, oral-genital, anal-genital, or oral-anal, whether between persons of the same or opposite sex; (b) bestiality; (c) masturbation; (d) sadistic or masochistic abuse; or (e) lascivious exhibition of the genitals or pubic area of any persons. *See* 18 U.S.C. § 2256(2).

h. "Visual depictions" include undeveloped film and videotape, data stored on computer disk or by electronic means which is capable of conversion into a visual image, and data which is capable of conversion into a visual image that has been transmitted by any means, whether or not stored in permanent

4

format. *See* 18 U.S.C. § 2256(5).

i.    "Website" consists of textual pages of information and associated graphic images. The textual information is stored in a specific format known as Hyper-Text Markup Language (HTML) and is transmitted from web servers to various web clients via Hyper-Text Transport Protocol (HTTP).

## USE OF COMPUTER-RELATED TECHNOLOGY

8.    Computers and Internet-accessible mobile devices have revolutionized the way in which sexual offenses against children are committed and how child pornography is produced, distributed, and utilized.  Computers and the internet have also revolutionized the way in which child sex offenders interact with one another and their victims.  Child pornography and other sexually explicit imagery was formerly produced using cameras and film (either still photography or movies).  The photographs required darkroom facilities and a significant amount of skill to develop and reproduce the images.  There were significant costs involved with the production of pornographic images.   To distribute these on any scale required significant resources.  The photographs themselves were somewhat bulky and required secure storage to prevent their exposure to the public.  The distribution of these wares was accomplished through a combination of personal contact, mailings, and telephone calls.   Any reimbursement would follow these same paths.

9.    The development of computers and Internet-accessible mobile devices has changed all of this.  Computers and Internet-accessible mobile devices serve four functions in connection with child exploitation crimes: production, communication, distribution, and storage.

10.    Previously, child sex offenders had to rely on personal contact, U.S. mail, or telephonic communications to sell, trade, or market child pornography or to make contact with child victims of sexual exploitation.  Now, electronic contact can be made to literally millions of digital devices around the world for real-time text, audio, and visual communication;   the

5

production, transmission, and storage of audio/video data; and the geo-locating of users.

11.     Contact with others in this online format can be either very open and at the same time anonymous or very private and personal in the form of person-to-person electronic communications. This communication structure is ideal for the child sex offender. The open and anonymous communication allows the user to locate others of similar inclination or potential child victims, while still maintaining his anonymity. Once contact is established, it is then possible to send messages and graphic images to a trusted conspirator or to a child. In addition to the use of large service providers, child sex offenders can use standard Internet connections—like as those provided by business, universities, and government agencies—to communicate with each other or their victims and to traffic in child pornography. These communications links allow contacts around the world.

12.     Additionally, these communications can be quick, relatively secure, and anonymous. These advantages are well known and are the foundation of commerce and communication by and between child sex offenders on the Internet.

### SUMMARY CONCERNING CHILD PORNOGRAPHY AND PERSONS WHO POSSESS AND COLLECT CHILD PORNOGRAPHY

13.     Based on my investigative experience and the training and experience of other law enforcement officers with whom I have had discussions, I have learned that individuals who utilize the Internet to view, download, and/or distribute child pornography are individuals who have a sexual interest in children and in images of children. In addition, there are certain characteristics common to such individuals, including the following:

        a.     Individuals who have a sexual interest in children or images of children may receive sexual gratification, stimulation, and satisfaction from contact with children, or from fantasies they may have viewing children engaged in sexual activity or in sexually suggestive poses, such as in person, in photographs, or other visual media, or from literature describing such activity.

6

b.      Individuals who have a sexual interest in children or images of children may collect sexually explicit or suggestive materials, in a variety of media, including photographs, magazines, motion pictures, videotapes, books, slides and/or drawings or other visual media. Individuals who have a sexual interest in children or images of children oftentimes use these materials for their own sexual arousal and gratification. Further, they may use these materials to lower the inhibitions of children they are attempting to seduce, to arouse the selected child partner, or to demonstrate the desired sexual acts.

c.      Individuals who have a sexual interest in children or images of children frequently maintain their "hard copies" of child pornographic material, that is, their pictures, films, video tapes, magazines, negatives, photographs, correspondence, mailing lists, books, tape recordings, etc., in the privacy and security of their home or some other secure location. Individuals who have a sexual interest in children or images of children typically retain pictures, films, photographs, negatives, magazines, correspondence, books, tape recordings, mailing lists, child erotica, and videotapes for many years.

d.      Likewise, individuals who have a sexual interest in children or images of children often maintain their collections that are in a digital or electronic format in a safe, secure, and private environment, such as a computer or cellphone, and surrounding area. These collections are often maintained for several years and are kept close by, usually at the collector's residence, or in online storage, email accounts, or other online communication accounts, to enable the individual to view the collection, which is valued highly.

e.      Individuals who have a sexual interest in children or images of children also may correspond with and/or meet others to share information and materials, rarely destroy correspondence from other child pornography distributors/collectors, conceal such correspondence as they do their sexually explicit material, and often maintain lists of names, addresses, and telephone numbers of individuals with whom they have been in contact and who share the same interests in child pornography. This data is typically in digital format, and often maintained on computers, cell phones and in online storage, email accounts or other online communication accounts.

f.      Individuals who would have knowledge on how to distribute and receive digital images of child pornography through the use of Peer to Peer networks and other online methods would have gained knowledge of its location through online communication with others of similar interest. Other forums, such as bulletin boards, newsgroups, IRC chat or chat rooms have forums dedicated to the trafficking of child pornography images. Individuals who utilize these types of forums are considered more advanced users and therefore more experienced in acquiring a collection of child pornography images.

g.      Individuals who have a sexual interest in children or images of children prefer not to be without their child pornography for any prolonged time period. This behavior has been consistently documented by law enforcement officers involved in the investigation of child pornography.

7

## TECHNICAL BACKGROUND ON DISCORD

14.     From my review of publicly available information provided by Discord about its service, including Discord's "Privacy Policy," I am aware of the following about Discord and about the information collected and retained by Discord.

15.     Discord owns and operates a free-access all-in-one voice and text chat application and website of the same name that can be accessed at http://www.discord.com.  In order to use Discord, a user creates an account and uses the account to communicate with other Discord users.  When signing up for a Discord account, the user must agree to Discord's Terms of Service, which state: "You agree not to use the Service in order to: violate any applicable laws or regulations, or promote or encourage any illegal activity . . ."

16.     Discord asks users to provide basic contact information to Discord, either during the registration process or thereafter.  The information may include the user's full name, birthdate, contact e-mail addresses, physical address (including city, state, and zip code), telephone numbers, screen names, websites , and other personal identifiers.  Discord also assigns a user identification number to each account.

17.     There are different features a user can access on Discord.  Discord users can exchange private messages between users – i.e., messages that do not appear in any text channel, but which are revealed only to the users participating in the private communication; participate in text chat room discussions; and voice chat.  Discord users can also create "servers" which are like message boards, that can only be accessed by users who have an "invitation link."  Within these servers, users can set up different "text channels," where users can type written text, upload files under eight megabytes, and record these communications.  Additionally, within these servers, users can be categorized and given designated roles.  Such categorization and

8

designation provides users with different levels of access to the server.

18.     Discord retains Internet Protocol ("IP") logs for a given user ID or IP address. These logs may contain information about the actions taken by the user ID or IP address on Discord, including information about the type of action, the date and time of the action, and the user ID and IP address associated with the action. For example, if a user views a Discord profile, that user's IP log would reflect the fact that the user viewed the profile, and would show when and from what IP address the user did so.

19.     Social networking providers like Discord typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number). In some cases, Discord users may communicate directly with Discord about issues relating to their account, such as technical problems, billing inquiries, or complaints from other users. Social networking providers like Discord typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

20.     The computers or servers of Discord are likely to contain all the material just described, including stored electronic communications and information concerning subscribers and their use of Discord, such as account access information, transaction information, and account activation.

21.     As explained herein, information stored in connection with a Discord account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element

or alternatively, to exclude the innocent from further suspicion.  In my training and experience, a Discord user's account activity, IP log, stored electronic communications, and other data retained by Discord, can indicate who has used or controlled the Discord account.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  Further, Discord account activity can show how and when the account was accessed or used.  For example, as described herein, Discord logs the Internet Protocol (IP) addresses from which users access their accounts along with the time and date.  By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the account access and use relating to the crime under investigation.   Such information allows investigators to understand the geographic and chronological context of Discord access, use, and events relating to the crime under investigation.  Additionally, Discord account activity may provide relevant insight into the Discord account owner's state of mind as it relates to the offense under investigation.  For example, information on the Discord account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

22.     Based on the information above, the computers of Discord are likely to contain all the material described above with respect to the Target Account, including stored electronic communications and information concerning subscribers and their use of Discord, such as account access information, which would include information such as the IP addresses and devices used to access the account, as well as other account information that might be used to identify the actual user or users of the account at particular times.

10

## Probable Cause

### A. DETAILS OF INVESTIGATION

23.     In October 2018, the FBI commenced a covert investigation into CROSSAN regarding unrelated federal offenses. During the course of that investigation, pursuant to a subpoena, the FBI identified CROSSAN's telephone number as                    reviewed CROSSAN's toll records for that telephone number, and learned that CROSSAN was communicating with a limited number of individuals. One of those individuals was unknown to the FBI. The FBI obtained subscriber information for that telephone number and discovered that the unknown individual was Minor Victim #1, a 17 year-old male who resided in Portland, Oregon. According to toll records, communications between CROSSAN and Minor Victim #1 began in March 2018 and continued throughout the time period encompassed by the toll records, which extended through June 2019.

24.     On or about November 6, 2019, an FBI agent approached Minor Victim #1 and conducted a consensual, non-custodial interview at Minor Victim #1's home, accompanied by Minor Victim #1's mother and father. During the interview, Minor Victim #1 confirmed his cellular telephone number. However, Minor Victim #1 stated that he was not in contact with anyone from the East Coast. The FBI asked Minor Victim #1 if he had interacted with CROSSAN on social media. Minor Victim #1 stated that he had not. Minor Victim #1 also confirmed that Minor Victim #1's own Instagram username was "Pentexsucks".

25.     After the meeting with Minor Victim #1, on or about January 10, 2020, the FBI discovered an Instagram account with username "Desu_Desu_Uwu". The FBI learned, in response to a subpoena, that the subscriber information for "Desu_Desu_Uwu" included CROSSAN's telephone number,            .            Accordingly, based on my training and

11

experience, I believe this evidence is indicia that "Desu_Desu_Uwu" is operated by CROSSAN. The FBI also discovered, through publicly available information on Instagram, that "Desu_Desu_Uwu" was "following" Minor Victim #1's account, "Pentexsucks".

26.     On or about January 31, 2020, an FBI agent conducted a second consensual, non-custodial interview of Minor Victim #1. When the FBI agent questioned Minor Victim #1 in the presence of his parents, Minor Victim #1 again denied knowing CROSSAN or communicating with anyone using CROSSAN's telephone number. The FBI agent then presented Minor Victim #1 with a screen capture (akin to a photograph of a computer screen) showing a list of Instagram accounts followed by "Desu_Desu_Uwu", including Minor Victim #1's Instagram account, "Pentexsucks". At that point, Minor Victim #1 requested to continue the interview outside the presence of his parents.

27.     Once Minor Victim #1 was alone with the FBI agent, Minor Victim #1 explained that he wanted to keep certain aspects of his personal life private from his parents. Minor Victim #1 stated that two years ago, when he was 15 years old, he suffered from depression and suicidal thoughts, and dealt with his mental illness through social media. He admitted that he connected with "Desu_Desu_Uwu"  around that time and exchanged telephone numbers with "Desu_Desu_Uwu".[1] Minor Victim #1 explained that his relationship with CROSSAN quickly turned sexual, and that Minor Victim #1 and CROSSAN sent each other sexual images. Minor Victim #1 declined to describe the images further during this interview. Minor Victim #1 described CROSSAN as "aggressive" and "manipulative," and said he felt like CROSSAN was "taking advantage" of Minor Victim #1's mental health issues.

---

[1] Minor Victim #1 did not state whether he knew that the user of (302) 312-4711 or "Desu_Desu_Uwu" was named James CROSSAN. As set forth herein, the FBI has probable cause to believe that the user of "Desu_Desu_Uwu" and (302) 312-4711 is CROSSAN. Given that probable cause, hereafter, for clarity, this affidavit refers to the user of "Desu_Desu-Uwu" and (302) 312-4711 as CROSSAN.

28.     On or about February 25, 2020, FBI agents returned to Minor Victim #1's home to request that Minor Victim #1 be interviewed by an FBI Child Advocate Forensic Interviewer ("CAFI"). Minor Victim #1 and his parents agreed to the interview. That same day, the FBI also executed a search warrant for Minor Victim #1's cellular telephone, the results of which are discussed further in paragraphs 18 - 20 below.

29.     On or about February 26, 2020, an FBI CAFI interviewed Minor Victim #1 regarding Minor Victim #1's relationship with CROSSAN. The voluntary interview took place at the Portland FBI office. In his interview, Minor Victim #1 stated the following:

a.   Minor Victim #1 first started communicating with CROSSAN in 2017, when Minor Victim #1 was 15 years old and a freshman in high school.[2] MINOR VICTIM #1 told CROSSAN that he was 15 years old and CROSSAN "kind of ignored it." CROSSAN never told MINOR VICTIM #1 his age, but MINOR VICTIM #1 knew he was in his 20s. CROSSAN also never disclosed his name. A couple of months into their communications, CROSSAN began "flirting," "talking sexually," and asking MINOR VICTIM #1 to send pictures of himself to CROSSAN. At first, MINOR VICTIM #1 hesitated to send photos because he was underage and knew CROSSAN was older. CROSSAN responded to this hesitation by threatening to stop talking to MINOR VICTIM #1, swearing, calling MINOR VICTIM #1 names, and making MINOR VICTIM #1 feel like he was wrong for not sending photos. In response to this pressure, MINOR VICTIM #1 started sending CROSSAN photos of himself. Once MINOR VICTIM #1 sent CROSSAN a photo of himself, CROSSAN complimented MINOR VICTIM #1, boosted MINOR VICTIM #1's self-esteem, and asked for more photos.

---

[2] Because MINOR VICTIM #1 did not state the exact date on which he began his relationship with CROSSAN, this Affidavit requests to search CROSSAN's electronic devices beginning on January 1, 2017. Likewise, because MINOR VICTIM #1 did not state whether and on what date he permanently ceased contact with CROSSAN, this Affidavit requests to search for data created through the date on which the Search Warrant is executed.

b. CROSSAN sent MINOR VICTIM #1 photos of himself "way more than once," and he asked MINOR VICTIM #1 for "graphic" photos "way more than once." The CAFI asked MINOR VICTIM #1 to describe the photos he sent to CROSSAN. MINOR VICTIM #1 explained that CROSSAN asked for photos of MINOR VICTIM #1's genitalia and told MINOR VICTIM #1 how to pose, although MINOR VICTIM #1 said he did not pose as directed. In some of the photos they sent each other, MINOR VICTIM #1 or CROSSAN had their hands on their genitalia. In some of the photos MINOR VICTIM #1 sent to CROSSAN, he had almost all of his clothes off "except a shirt or whatever."

c. During MINOR VICTIM #1's sophomore year of high school, CROSSAN asked MINOR VICTIM #1 to send a video of himself "beating off," which Your Affiant understands as common slang for masturbating. MINOR VICTIM #1 was not comfortable sending the video, but eventually "did it" because CROSSAN was "really annoying" about demanding the video. MINOR VICTIM #1 thought CROSSAN would stop asking MINOR VICTIM #1 to send photos or videos once MINOR VICTIM #1 sent the video of himself "jerking off" (another slang term for masturbating). CROSSAN, MINOR VICTIM #1 explained, did not stop.

d. CROSSAN also asked MINOR VICTIM #1 for his home address so CROSSAN could send MINOR VICTIM #1 gifts, and so they could meet in person. MINOR VICTIM #1 told CROSSAN he lived in Portland, but never disclosed his address.

e. MINOR VICTIM #1 explained that most of his communications with CROSSAN took place via Instagram, many using an Instagram account of MINOR VICTIM #1's that was deleted. MINOR VICTIM #1 explained that he sent images of himself via Instagram rather than text message because Instagram photos were deleted after two views,

14

unless the recipient took a screen shot. MINOR VICTIM #1 also explained that he took most of the photos of himself using an old cellular telephone which he no longer possesses.

30.     The results of the search of MINOR VICTIM #1's telephone revealed text message correspondence between MINOR VICTIM #1 and CROSSAN throughout the period from March 18, 2018, through August 20, 2019.[3] In addition, the search warrant results also show that CROSSAN and MINOR VICTIM #1 sent each other many multimedia messages (messages which may include photographs or videos), but do not show the content of those multimedia messages.

31.     Text message communications between MINOR VICTIM #1 and CROSSAN confirm that CROSSAN was aware that MINOR VICTIM #1 was a minor. In correspondence on June 8, 2019, CROSSAN sent MINOR VICTIM #1 a message stating "You're like 16 dude", and on July 6, 2019, CROSSAN sent MINOR VICTIM #1 a message stating "Sounds good for a 16 year old". In addition, on multiple occasions, CROSSAN mentioned that MINOR VICTIM #1 was in "school", and referenced wondering what MINOR VICTIM #1's parents would think about MINOR VICTIM #1's behavior.

32.     In addition, the text messages between MINOR VICTIM #1 and CROSSAN include evidence of CROSSAN's efforts to entice MINOR VICTIM #1 to send CROSSAN graphic, sexual photos of himself. The text messages fall into the following general categories: (a) compliments to MINOR VICTIM #1; (b) requests for photos of MINOR VICTIM #1; (c) offers to send MINOR VICTIM #1 gifts; (d) expressions of a desire to meet in person; (e) messages creating the illusion of an intimate, trusting relationship; and (f) explicit conversations

---

[3] The correspondent Your Affiant has identified as CROSSAN is an individual using the telephone number (302) 312-4711, which, as explained above, is subscribed to James CROSSAN. In addition, on July 19, 2019, the person using CROSSAN's telephone number sent MINOR VICTIM #1 a series of text messages reading: "My name?" "You know it?" "Wow" "It's James you nerd". James is CROSSAN's first name.

about sexual acts. It is Your Affiant's understanding that these types of communications are common methods by which child sex offenders build relationships with minors, wear down minors' defenses, and entice minors to engage in sexual activities including taking and sharing graphic photos. Examples of CROSSAN's text messages within each category are as follows, with typos as they appear in the messages:

a.) **Compliments to MINOR VICTIM #1**: On March 18, 2018, CROSSAN sent MINOR VICTIM #1 text messages stating: "You're cute as hell though" and "it's crazy how cute you are". On April 14, 2019, CROSSAN told MINOR VICTIM #1, "You're so f*** beautiful and I have tears in my eyes that you love me". On July 16, 2019, MINOR VICTIM #1 sent CROSSAN a multimedia message and CROSSAN replied, "Such a cutie pie". CROSSAN later added, in a series of text messages, "You're such a sweetheart", "I'm genuinely happy [to] know you", and "To me you're beautiful and a sweetheart. What's inside counts the most". On July 25, 2019, MINOR VICTIM #1 asked CROSSAN why CROSSAN liked MINOR VICTIM #1, and CROSSAN responded, "I think you're a wholesome subby femboy"[4] and "I [n]ever had feelings for a guy but you're so sweet to me".

b.) **Requests for photos of MINOR VICTIM #1**: On April 13, 2019, MINOR VICTIM #1 told CROSSAN that he was "about to shower", and CROSSAN responded "I already did that. I should of sent you pics before I did. Maybe you should [send] me some." MINOR VICTIM #1 then sent CROSSAN a multimedia message, and CROSSAN replied, "Thank you pentex-chan", which Your Affiant believes is a reference to MINOR VICTIM #1's admitted Instagram username, "Pentexsucks". CROSSAN added, "I was hoping for a body pic but ok", followed by "I wanna kiss your thighs." Over the course of the conversation,

---

[4] Your Affiant believes, based on CROSSAN's conversations with MINOR VICTIM #1 and internet research, that "subby" means "subordinate," specifically in the context of a dominant-submissive romantic or sexual relationship, and "femboy" refers to a feminine boy.

CROSSAN also said "Let me see more . . . Don't be a tease" and "I'll show mine if you show me yours." CROSSAN then escalated the conversation by stating, "I wanna cum for you tonight. I love you so much". CROSSAN then sent MINOR VICTIM #1 a multimedia message and stated, "Your turn", "I need it", "Please". As Your Affiant interprets this conversation, CROSSAN repeatedly asked for photos of MINOR VICTIM #1, including a "body pic" and graphic images that would sexually gratify CROSSAN. In addition to this conversation, on May 27, 2019, CROSSAN sent MINOR VICTIM #1 a series of text messages stating, "I wanna dress you up. You've been talking about it for a while plus you said you wore dresses. Got any pics in them?" On July 6, 2019, CROSSAN asked MINOR VICTIM #1 for "cute pics of you." On July 16, 2019, CROSSAN stated he was "excited to get more pictures from you." Shortly thereafter, CROSSAN more directly stated "Send pics."

    c.)   **Offers to give MINOR VICTIM #1 gifts**: On June 1, 2019, CROSSAN sent MINOR VICTIM #1 a text message stating "I wish [we] talked more . . . If we were closer I would buy you gifts." On July 19, 2019, CROSSAN said, "Remind me to get you something cute to wear on your birthday."

    d.)   **Expressions of a desire to meet in person**: On April 13, 2019, CROSSAN sent MINOR VICTIM #1 a text message stating, "I wanna see you." MINOR VICTIM #1 replied that he had "just sent you a photo of me lol." CROSSAN responded, "I meant irl" and "Would you want me to come over or something?"[5] MINOR VICTIM #1 expressed that he would be embarrassed if they met in person, and CROSSAN responded, "Well you better get over it because I don't want to be just a gay online couple." CROSSAN later added, "I wish I could hold you tonight. I could use a hug and a kiss. You make my life worth

---

[5] Your Affiant understands "lol" to be common shorthand for "laugh out loud" and "irl" to be common shorthand for "in real life."

17

it." CROSSAN then asked again, "What's stopping us from meeting up?" And MINOR VICTIM #1 replied, "Me being scared and awkward." CROSSAN replied, "But you said you love me." On January 19, 2019, CROSSAN said to MINOR VICTIM #1, "At least tell me the city you live in so I can see how far away you are. Because . . . *maybe* I do want to come over and chill with you and do gay stuff with my internet boyfriend."

e.) **Messages creating the illusion of an intimate, trusting relationship**: On April 13, 2019, CROSSAN sent MINOR VICTIM #1 a text message stating, "I wanna run away with you and start a new life". CROSSAN added, "Just tired of being lonely and picked on" and "Please tell me you love me". The following day, on April 14, 2019, CROSSAN told MINOR VICTIM #1, "You're like the only person I feel I can be open with and like I say, you're just the sweetest thing so I'm happy to have you back in my life". On May 22, 2019, CROSSAN asked MINOR VICTIM #1 to "cheer me up" because "I'm feeling down today". When MINOR VICTIM #1 asked what was wrong, CROSSAN said, "Just life. I try to be happy all the time but I feel so alone". Your Affiant interprets these conversations as attempts to make MINOR VICTIM #1 feel like CROSSAN's trusted confidante and to create an illusion of intimacy.

f.) **Explicit conversations about sexual acts**: On May 9, 2019, in a series of text messages to which MINOR VICTIM #1 did not respond, CROSSAN said, "Are you telling me you want to get f***ed by a big masculine man while you're crossdressing as a qt anime girl?"[6] CROSSAN added, "Be honest with yourself b**ch" and "You're the lewdest person I know". On May 12, 2019, CROSSAN asked MINOR VICTIM #1, "When are you gonna man up and be my bottom bf",[7] to which MINOR VICTIM #1 responded, When r u gonna rape me".

---

[6] Your Affiant understands "qt" to be shorthand for "cutie" and an "anime girl" to be a reference to Anime, a Japanese animation and illustration style.

[7] Your Affiant understands "bf" to be common shorthand for "boyfriend."

18

CROSSAN replied, "After you fill out a legal document so you can't say I actually did rape you". After MINOR VICTIM #1 replied, "Oh you know what I mean", CROSSAN confirmed: "You just want me to dominate you" and "It's hot when you tell me what you like".

33.    In addition to their text message correspondence, the FBI has learned that CROSSAN and MINOR VICTIM #1 communicated on the social media platform Discord. On April 9, 2020, MINOR VICTIM #1 voluntarily sent the FBI screen captures of what MINOR VICTIM #1 identified as communications between himself, using the username "Pentex", and CROSSAN, using the username "Bimmy."[8] The FBI has identified Bimmy as CROSSAN's Discord username, as set forth in Section B below.

34.    The Discord conversations MINOR VICTIM #1 shared with the FBI include a message sent from CROSSAN to MINOR VICTIM #1 on January 21, 2019, stating, "Worship me b**ch". CROSSAN then sent MINOR VICTIM #1 two photos of a naked man from the top of the pelvis down to the lower legs. The focus of one of the photos is a flaccid penis. The focus of the other photo is testicles. After sending the two images, CROSSAN sent MINOR VICTIM #1 messages stating: "I'm the best bf, ain't I?" "How does it compare to yours?" and "Do what I told you to do, b**ch". MINOR VICTIM #1 responded "SORRY I'M EATING AAA" and CROSSAN replied, "HURRY UP B**CH. I'm gonna take a shower and when I get back I better see it."

35.    On June 12, 2020, CROSSAN was arrested, advised of his *Miranda* rights, and transported to the Delaware State Police, Troop 2 Station, where he gave an interview. In the

---

[8] As stated elsewhere in this Affidavit, MINOR VICTIM #1 has not affirmatively stated he knows the name of the person who uses the telephone number (302) 312-4711, the Instagram account Desu_Desu_Uwu, and the Discord account Bimmy, however, MINOR VICTIM #1 has been clear that he knows the same person uses all three forms of communication. As stated in this Affidavit, the FBI has probable cause to believe that CROSSAN is the user of all three forms of communication, and Your Affiant refers to that individual as CROSSAN herein for clarity.

course of that interview, CROSSAN admitted to communicating with Minor Victim #1 and receiving nude images from Minor Victim #1.   CROSSAN also stated Minor Victim #1 contacted CROSSAN at some point in early 2020 and informed CROSSAN that the FBI was investigating him.  In response, CROSSAN admitted to deleting data from his electronic devices.

### B. CONFIRMATION OF USER ATTRIBUTION

36.    Your Affiant has attributed the TARGET ACCOUNT to CROSSAN for the following reasons:

a)    In response to a Grand Jury subpoena, the FBI learned that the Discord account username which displays as "Bimmy" has the full username "Bimmy#4323" (the TARGET ACCOUNT) and the listed email address '         ¨                          ɩ".

b)    FBI agents conducted a trash pull outside CROSSAN's home address on September 18, 2019, and located packaging material addressed to "Bimmy Jew".  This supports Your Affiant's belief that Crossan goes by the name "Bimmy" or "Bimmy Jew" and uses the email address                          ɩ.  The FBI confirmed CROSSAN's home address (

) through FBI surveillance and a law enforcement database check.

c)    In addition, in response to a Grand Jury subpoena, the FBI learned that ⁻     ¨¨   ⁻ɩ has IP address activity virtually identical to that of the email address                          ɩ.  In particular, someone logged onto         ⁻   ¨¨   ɩ within a minute of logging onto                              , using the same IP address four times over the time period from October 2019 through January 2020.

       d)     In response to a Grand Jury subpoena, the FBI learned that _____ ⌐̣̲̲_____om has a listed recovery telephone number of ⌐̣   ,          and the recovery email address _̲_ ____.  ⌣  ·    n (i.e., James D. Crossan).

       e)     As stated elsewhere in this Affidavit, in response to a Grand Jury subpoena, the FBI learned that                    is CROSSAN's telephone number.

## C. SUMMARY

37.    Based on the facts detailed above, there is probable cause to believe that CROSSAN used the TARGET ACCOUNT to entice and attempt to entice a minor to engage in unlawful sexual activity, in violation of 18 U.S.C. 2422(b) (the SUBJECT FEDERAL OFFENSES), and that evidence, fruits, and instrumentalities of the SUBJECT FEDERAL OFFENSES will be found on the TARGET ACCOUNT.

### Information To Be Searched And Things To Be Seized

38.    I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular Title 18, United States Code, Sections 2703(a), (b)(1)(A), and (c)(1)(A), by using the warrant to require Discord to disclose to the government copies of the records and other information (including the content of communications) particularly described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

## Conclusion

Based on the foregoing information, I respectfully submit that there is probable cause to believe that evidence, fruits, and instrumentalities of violations of the SUBJECT FEDERAL OFFENSES as set forth herein and in Attachment B, are currently contained in the TARGET ACCOUNT, more fully described in Attachment A. I therefore respectfully request that a search warrant be issued authorizing a search of the TARGET ACCOUNT for the evidence, fruits, and instrumentalities, described in Attachment B. Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant. The government will execute this warrant by serving it on Discord. Because the warrant will be served on Discord, who will then compile the requested records at a time convenient to it, there exists reasonable cause to permit the execution of the requested warrant at any time in the day or night.

Respectfully submitted,

Francis Cesare
Special Agent
Federal Bureau of Investigation

Sworn and subscribed before me this 16 th day of July, 2020.

HONORABLE JENNIFER L. HALL
UNITED STATES MAGISTRATE JUDGE
DISTRICT OF DELAWARE

## ATTACHMENT A

**Property to Be Searched**

This warrant applies to information associated with the Discord profiles with identifiers:

Username "Bimmy" with User ID #4323 (Target Account)

As detailed in Attachment B, this information is stored at premises owned, maintained, controlled, or operated by Discord, Inc., a company that is headquartered in San Francisco, California.

**ATTACHMENT B**

**Particular Things to be Seized**

I.    **Information to be disclosed by Discord, Inc.**

To the extent the information described in Attachment A is within the possession, custody, or control of Discord, Inc., including any messages, records, files, logs, or information that have been deleted but are still available to Discord, Inc., is required to disclose the following information to the government for each account listed in Attachment A from January 1, 2017, to present:

a.    All identity and contact information, including full name, e-mail address, physical address (including city, state, and zip code), date of birth, phone numbers, gender, hometown, occupation, and other personal identifiers;

b.    All past and current usernames associated with the account;

c.    The dates and times at which the account and profile were created, and the Internet Protocol ("IP") address at the time of sign-up;

d.    All activity logs including IP logs and other documents showing the IP address, date, and time of each login to the account, as well as any other log file information;

e.    All information regarding the particular device or devices used to login to or access the account, including all device identifier information or cookie information, including all information about the particular device or devices used to access the account and the date and time of those accesses;

f.    All data and information associated with the profile page, including photographs, "bios," and profile backgrounds and themes;

g.    All communications or other messages sent or received by the account;

h.    All user content created, uploaded, or shared by the account, including any comments made by the account on photographs or other content;

i.    All photographs and images in the user gallery for the account;

j.    All location data associated with the account, including geotags;

k.    All data and information that has been deleted by the user;

l.   A list of the user's "friends," as well as a list of people with whom the user has shared a Discord server;

m.   A list of all users that the account has blocked;

n.   All privacy and account settings;

o.   All records of Discord searches performed by the account, including all past searches saved by the account;

p.   All information about connections between the account and third-party websites and applications; and,

q.   All records pertaining to communications between Discord, Inc. and any person regarding the user or the user's Discord account, including contacts with support services, and all records of actions taken, including suspensions of the account.

Discord is hereby ordered to disclose the above information to the government within 14 days of service of this warrant.

**II.   Information to be seized by the government**

All information described above in Section I that constitutes fruits, evidence and instrumentalities of violations of Title 18, United States Code, Section 2422(b) (Coercion or Enticement of a Minor and Attempt to Coerce or Entice a Minor) involving James CROSSAN since January 1, 2017, including, for the username identified on Attachment A, information pertaining to the following matters:

a)   All records related to child erotica, child pornography, and the sexual exploitation of children;

b)   All records relating to who created, used, or communicated with the account and user ID, including records about their identities and whereabouts;

c)   Evidence indicating how and when the Discord account and user ID were accessed or used, to determine the geographic and chronological context of account access, use, and events relating to the crimes under investigation; and

d)   Evidence indicating the account user's state of mind as it relates to the crimes under investigation.

This warrant authorizes a review of electronically stored information, communications, other

2

records and information disclosed pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the FBI may deliver a complete copy of the disclosed electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

**III.   DEFINITIONS**

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored.